## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **DERRICK PERSON,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. No. 2022-cv-** |
| | : | |
| **PATRICIA COYNE-FAGUE, alias, individually** | : | **Jury Trial Demanded** |
| **and in her official capacity as director of the** | : | |
| **Rhode Island Department of Corrections,** | : | |
| **JENNIFER CLARKE, alias, individually and in** | : | |
| **her official capacity as medical director of the** | : | |
| **Department of Corrections, RUIZ DINIZ,** | : | |
| **alias, individually and in his official capacity as** | : | |
| **warden of the John J. Moran Medium Security** | : | |
| **Facility, SILKA DISLA, alias, individually and** | : | |
| **in her official capacity, DENISE, alias,** | : | |
| **individually and in her official capacity,** | : | |
| **AMELIA ELLING, alias, individually and in** | : | |
| **her official capacity as a registered nurse of the** | : | |
| **Department of Corrections, LORRAINE WARE,** | : | |
| **alias,  individually and in her official capacity as** | : | |
| **a registered nurse of the  Department of** | : | |
| **Corrections, CYNTHIA SMITH, alias,** | : | |
| **individually and in her official capacity as a** | : | |
| **registered nurse of the Department of Corrections,** | : | |
| **STATE OF RHODE ISLAND, DEPARTMENT** | : | |
| **OF CORRECTIONS, alias; and JOHN DOE,** | : | |
| **alias** | : | |
| **Defendants** | : | |

## COMPLAINT

## I.     Introductory Statement

This action is brought by the Plaintiff seeking compensatory and punitive damages as well

as counsel fees and costs for acts and/or omissions of Defendants in violation of the Eighth and

Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983,

Article 1, §§ 2 and 8 of the Rhode Island Constitution, directly actionable in accordance with *Jones*

*v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).  Additionally, the Plaintiff is seeking relief

for the same acts and/or omissions of Defendants amounting to negligence and for acts and/or omissions of Defendant Jennifer Clarke, Defendant Nurse Elling, Defendant Lorraine Ware, Defendant Cynthia Smith amounting to medical malpractice.

## II.   Parties

1.      Plaintiff Derrick Person ("Person" or "Plaintiff") is a fifty (50) year old male, and at all relevant times pertinent hereto was a resident and citizen of the State of Rhode Island and of the United States, and was at all times pertinent incarcerated under the care and custody of the Defendant State of Rhode Island, Department of Corrections' ("DOC").

2.      Defendant Patricia Coyne-Fague ("Coyne-Fague"), alias, is a citizen and resident of the State of Rhode Island and of the United States.  Coyne-Fague is sued herein individually and in her official capacity and at all relevant times pertinent hereto was the Director of the DOC.

3.      Defendant Jennifer Clarke ("Clarke" or "Defendant Clarke"), alias, is sued individually and in her official capacity for her acts and/or omissions while acting as medical director of DOC facilities.

4.      Defendant Ruiz Diniz ("Diniz" or "Defendant Diniz"), alias, is sued individually and in his official capacity for his acts and/or omissions while acting, upon information and belief, as the Warden of the John J. Moran Medium Security Facility ("Medium Security Facility") in January and February 2019.

5.      Defendant Silka Disla ("Disla" or "Defendant Disla"), alias, is sued individually and in her official capacity while acting, upon information and belief, as the first shift dispensary reception officer of the Medium Security Facility in January and February 2019.

6.      Defendant Denise[1] ("Denis" or "Defendant Denis"), alias, is sued individually and in her official capacity while acting, upon information and belief, as the second shift dispensary reception officer of the Medium Security Facility in January and February 2019.

7.      Defendant Lorraine Ware ("Ware" or "Defendant Ware"), alias, is sued individually and in her official capacity while acting, upon information and belief, as a Registered Nurse employed by DOC and specifically as a first shift nurse assigned to the med line in January and February 2019.

8.      Defendant Cynthia Smith ("Smith" or "Defendant Smith"), alias, is sued individually and in her official capacity while acting, upon information and belief, as a Registered Nurse employed by DOC and specifically as a first and second shift nurse assigned to the med line in January and February 2019.

9.      Defendant Amelia Elling ("Elling" or "Defendant Elling"), alias, is sued individually and in her official capacity while acting as a Registered Nurse employed by DOC.

10.     Defendant John Doe, alias, is an unknown employee, agent, representative, or contractor of the DOC whose acts and/or omissions, particularly determining, instituting, and/or approving the "no sick call" policy that was in effect during the events described below, was responsible for, or contributed to, the harm and damages sustained by the Plaintiff as alleged herein.

11.     Defendant State of Rhode Island is sued on the basis of acts and/or omissions committed by employees and agents of the DOC, a department established to provide for the custody, care, discipline, training, treatment, and study of persons committed to state correctional institutions pursuant to R.I. Gen. Laws § 42-56-1 *et. seq.*  At all relevant times hereto, the DOC

---

[1] Defendant Denise's first name is currently unknown.

employed the named individual defendants either as employees or contract agents. Defendant State is subject to the jurisdiction of this Court in accordance with the State of Rhode Island's express waiver of sovereign immunity pursuant to R.I. Gen. Laws § 9-31-1 and other applicable law. *Marrapese v. State*, 500 F.Supp. 1207, 1221-23 (D.R.I. 1980).

12.     Unless otherwise specified, the term "Defendants" as hereinafter used shall refer collectively to each and every Defendant named or described in the instant action.

13.     Unless otherwise specified, the term "individual Defendants" as hereinafter used shall refer collectively to each and every Defendant named or described in the instant action except the Defendant State.

### III.     <u>Jurisdiction</u>

14.     This Court has jurisdiction under 28 U.S.C. §§1331, 1343, 1367, 2201 and 2202.

### IV.     <u>Venue</u>

15.     Venue is proper in this Court as, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391. Venue is also proper because a substantial part of the acts and/or omissions giving rise to the claims occurred in the District of Rhode Island.

### V.     <u>Material Facts</u>

16.     On January 28, 2019, Plaintiff was transported from the Medium Security Facility to Rhode Island Hospital to undergo a Right Inguinal Hernia with Mesh Repair ("Hernia Repair").

17.     Plaintiff's Hernia Repair was performed by Michael D. Connolly, M.D. ("Dr. Connolly") around 8 a.m. without any complications during or immediately following the surgery.

18.     Plaintiff was discharged by Rhode Island Hospital at approximately 11 a.m.

19.     Rhode Island Hospital provided the following discharge instructions:

    a.      Call MD for: severe uncontrolled pain

    b.      Call MD for: temperature greater than 101 F for more than 24 hours

    c.      Call MD for: Incision redness, swelling, warmth, bleeding, drainage

    d.      Call MD for: bleeding occurs or continues

    e.      Call MD for: develop rash or hives

    f.      Call MD for: difficulty breathing

    g.      Call MD for: increased swelling in arm, leg, ankle, or abdomen

    h.      Call MD for: pain or pressure in chest, jaw, arm, back, neck

    i.      Go to ED or call 911 if: unable to reach physician

20.    Upon return to the Medium Security Facility ("the facility"), Plaintiff was transported to the dispensary where he was evaluated by Registered Nurse Debra Ouimette ("Nurse Ouimette") at 12:13 p.m., who confirmed in Plaintiff's medical chart that she reviewed the paper chart documents received from Rhode Island Hospital as part of this evaluation.

21.    Upon information and belief, the paper chart documents received from Rhode Island Hospital included the discharge instructions described above.

22.    Plaintiff was then assisted back to his cell in a wheelchair by inmate Freddie Espinal, an inmate working in the dispensary, at Defendant Disla's request.

23.    Upon information and belief, Defendant Disla was assigned to be the first shift reception officer in the dispensary between 7 a.m. and 3 p.m. each day between January 28, 2019 and February 1, 2019 and present in the dispensary during those hours each time that Plaintiff visited.

24.    At approximately 6:45 p.m., Plaintiff presented to medical and was seen by Nurse Ouimette, who wrote in a medical note for Post-Operative Vital Sign Check that Patient tolerated

noodles in the evening, was drinking fluids, voiding without difficulty, had improved pallor, and reported, "I do feel better."

25.    Plaintiff received prescribed Oxycodone from the med line at the dispensary at 4 p.m. and 8 p.m. that day.

26.    When Plaintiff awoke the next morning, January 29th, he noticed some swelling and pain in his genital area and thought that it was a normal reaction to the surgery; Plaintiff's pain was at a five out of ten (5/10) on the pain scale often used by medical professionals.

27.    Plaintiff heard an announcement over the facility's loudspeaker declaring that there would be "No Sick Call" that day.

28.    Upon information and belief, Defendant Disla made the announcement.

29.    Upon information and belief Defendants Coyne-Fauge, Clarke Diniz, and Doe, made and/or approved of the decision to have no sick call during this day and the following days and did not direct DOC employees and agents, including Defendants, to use alternative means of providing necessary medical treatment in-lieu of sick call.

30.    Plaintiff received prescribed Oxycodone from the med line at the dispensary at 8 a.m., 12 p.m., 4 p.m., and 8 p.m. that day.

31.    On January 30, 2019, Plaintiff noticed that the swelling and pain had increased and wanted to visit medical for an evaluation.

32.    At this time, Plaintiff's pain level was at a 6/10.

33.    However, as he was preparing to go eat breakfast, Plaintiff heard another announcement over the facility's loudspeakers that there would be "No Sick Call" that day.

34.    Even though Plaintiff heard this announcement, he knew something was wrong with his recovery from the surgery and decided to go to the dispensary to try to get evaluated.

35.     Plaintiff walked to the med line either at 8 a.m. or 12 p.m. and explained to the nurse staffing the med line at that time, upon information and belief, Defendant Ware, that he had just undergone surgery two days prior and was having unusual swelling and pain.[2]

36.     Plaintiff was told by Defendant Ware, "There is no sick call today so there is nothing that can be done for you.  Try coming back in the evening."

37.     Even when there is no medical care available at one or more of the DOC's facilities, whether due to time of day, holidays, staffing issues, or anything else, there is always at least one medical professional available at the Intake Services Center Facility that inmates can be brought to see.

38.     Further any nurse can order that an inmate be sent to the Emergency Department at Rhode Island Hospital for emergency medical care when necessary and/or when it cannot be provided at the ACI.

39.     Plaintiff again tried to explain that it was important because he had just had surgery two days ago, and was again told by Defendants Ware and Disla that "There is nothing we can do."

40.     Plaintiff was specifically told by Defendant Disla that he could try again tomorrow.

41.     Both Defendant Ware and Defendant Disla refused to evaluate Plaintiff or send him to Intake or to the Emergency Department at Rhode Island Hospital to be seen, both of which options were available to them, and instead refused to provide any medical care or evaluation beyond dispensing the prescribed Oxycodone to Plaintiff.

42.     Plaintiff received prescribed Oxycodone from the dispensary at 8 a.m., 12 p.m., 4 p.m., and 8 p.m. that day.

---

[2] Plaintiff believes that the nurse he spoke to was Defendant Ware based on the signature on Plaintiff's Oxycodone Controlled Drug Count Sheet, attached hereto as **Exhibit A.**

43.    When Plaintiff returned for his medication at 4 p.m. and 8 p.m., he tried to convince Defendant Smith, the nurse staffing the med line at those times, to evaluate him because of the risk of post-operation complications, but he was told the same thing by Defendant Smith and Defendant Denise—there was nothing that could be done for him.

44.    Upon information and belief, Defendant Denise was assigned to be the second shift reception officer in the dispensary between 3 p.m. and 11 p.m. each day between January 28, 2019 and February 1, 2019 and present in the dispensary during those hours each time that Plaintiff visited.

45.    On January 31st, Plaintiff woke up and found that the swelling and pain in his genitals had gotten even worse; his pain level was now at a 7/10.

46.    That same morning Plaintiff again heard an announcement in the morning, believed to be made by Defendant Disla, that there would be no sick call that day.

47.    Plaintiff again went to the dispensary to try to get someone to evaluate him as he was becoming more stressed and worried about his medical condition, which appeared to him to be worsening; an apprehension that would prove to be correct when he finally received medical attention.

48.    Plaintiff walked past the med line into the dispensary and specifically complained to Defendant Disla that he was having complications from his surgery three days prior and that his genitals were even more swollen and painful than the day before.

49.    Defendant Disla refused to send Plaintiff to Intake or to the Emergency Department at Rhode Island Hospital to be seen, both of which options were available, and instead refused to provide any medical care or evaluation and ignored Plaintiff's complaints and worsening condition.

50.     The nurse staffing the med-line at the time, believed to be Defendant Ware, and any other nurse who was in the dispensary, who would have heard his complaint and did nothing.

51.     Plaintiff was again told that there was no sick call available and advised to come back later that night.

52.     That evening, Plaintiff again went to the dispensary, was again told by Defendant Denise that there was no sick call and told to try again in the morning.

53.     Plaintiff received prescribed Oxycodone from the dispensary at 8 a.m., 12 p.m., and 4 p.m. that day, at which time his prescription ran out.

54.     Upon information and belief, Cory Fink, N.P. ("N.P. Fink") ordered twenty (20) tablets of Oxycodone for Plaintiff, but only twelve tablets were provided between January 28th and January 31st before Plaintiff was told that his prescription ran out.

55.     On February 1st, Plaintiff awoke in extreme pain with very swollen testicles; at this point, Plaintiff's pain level was at an 8 or 9/10.

56.     As with the prior days, Plaintiff again heard an announcement that there was no sick call that day, believed to be issued by Defendant Disla, but Plaintiff again went to the dispensary to beg someone to see him.

57.     First, Plaintiff went to the nurse staffing the med line at 8 a.m., upon information and belief, Defendant Smith, and explained that he was in extreme pain, but he was told that his Oxycodone prescription had run out.

58.     Defendant Smith told Plaintiff that she would see if N.P. Fink, the supervising nurse, could order more of Plaintiff's prescription.

59.     Upon information and belief, N.P. Fink was contacted and informed about Plaintiff's condition but did not take any action to provide Plaintiff with treatment.

60.     Plaintiff responded that he was in extraordinary pain, was clearly suffering from a post-operative complication and needed medical attention immediately.

61.     Defendant Smith simply told Plaintiff there was nothing she could do.

62.     Defendant Disla observed this interaction and told Plaintiff again that there was nothing that could be done for him because there was no sick call and said to try again in the evening.

63.     Defendant Disla and Defendant Smith refused to send Plaintiff to Intake or to the Emergency Department at Rhode Island Hospital to be seen, both of which options were available, and instead refused to provide any medical care or evaluation and ignored Plaintiff's complaints and condition which now included extreme pain and swelling, a condition that even a layperson would know required medical attention.

64.     When Plaintiff reported to the dispensary in the evening, he was again told by Defendant Denise there was nothing that could be done for him.

65.     Defendant Elling, who was standing next to Defendant Denise at the time and staffing the dispensary, listened to Plaintiff's conversation with Defendant Denise but said nothing, refusing to evaluate Plaintiff despite his obvious and considerable pain.

66.     Defendant Denise told Plaintiff that the only patients being seen were on a list, but Defendant Elling and Defendant Denise refused to put him on this list to be seen, stating he had to fill out a medical request slip in order to be considered for the list.

67.     Ordinarily, submitting a medical request slip for medical treatment took several days under the best of circumstances, so Plaintiff declined to fill out a slip and instead repeatedly asked to be seen immediately.

68.     Defendant Elling and Defendant Denise also refused to send Plaintiff to Intake or to the Emergency Department at Rhode Island Hospital to be seen, both of which options were available, and instead refused to provide any medical care or evaluation and ignored Plaintiff's complaints and condition that now included extreme pain and swelling, a condition that even a layperson would know required medical attention.

69.     Defendant Elling, Defendant Denise, and Defendant Smith also did not provide Plaintiff with his prescribed Oxycodone on this day despite it being prescribed and despite Plaintiff's extreme pain, which was well beyond what was to be expected during a normal recovery.

70.     On February 2, Plaintiff again heard an announcement that there was "No Sick Call," but again went to the dispensary in the morning and complained about his still worsening condition.

71.     At this point, Plaintiff was bent over at the waist and unable to stand upright due to excessive swelling and extreme pain, now at a 10/10, which had been worsening for five (5) days without evaluation or treatment.

72.     This time Defendant Elling finally agreed to evaluate Plaintiff, despite there officially being no sick call that day.

73.     At 9:08 a.m., immediately upon evaluating Plaintiff's genitals, Nurse Elling completed an Emergency Room Referral for an appointment "ASAP," noting that Plaintiff's chief complaint was "new onset R testicle pain, redness s/p R inguinal hernia repair 1/28/2019."

74.     Defendant Elling or any other DOC medical staff could have completed such an Emergency Room Referral at anytime during the preceding days when they refused to provide any evaluation or treatment for Plaintiff's increasingly painful and dire medical condition.

75.     In the reason for the referral, Defendant Elling wrote, "please assess for impaired healing; R inguinal hernia repair 1/28/19 – pain 10/10 radiates up R groin into abdomen – swelling, redness and pain, R testicle onset yesterday."

76.     Plaintiff arrived at Rhode Island Hospital at 9:40 a.m. and at 10:14 a.m., Plaintiff was admitted to the Rhode Island Hospital emergency department.

77.     Plaintiff was evaluated by resident Joanne Chang, MD, who wrote Plaintiff's Chief Complaint was: "Recent surgery.  Unable to get any nursing care the last three days.  States positive swelling in area. …presents with increased pain and swelling around his surgical site and his right testicle since surgery…Endorses lower abdominal pain. …Inguinal pain was controlled with stronger pain medications, but pain has been uncontrolled since Friday when he was on ibuprofen/APAP."

78.     Following Plaintiff's evaluation and consultation with urology, Plaintiff was preliminarily diagnosed with right testicular torsion and transferred to the OR.

79.     Testicular torsion is a condition wherein the spermatic cord, which provides blood flow to the testicle, rotates and becomes twisted, cutting off blood supply to the testicle that causes sudden pain and swelling and usually requires emergency surgery to save the testicle.

80.     After the initial evaluation, one of the ER doctors approached Plaintiff to explain what was going on.

81.     Plaintiff was accompanied by two correctional officers, CO Bonafilo and CO Carbury, who listened to Plaintiff's confidential conversations with medical providers.

82.      The doctor said that he was not sure what the cause of Plaintiff's pain and swelling was and that he would not know whether it was related to his recent hernia surgery until an exploratory surgery was conducted.

**Page 12 of 22**

83.     The doctor told Plaintiff that the problem was due to the negligence of RIDOC medical staff for not bringing him in earlier and asked Plaintiff what the medical staff had done to treat him up to that point.

84.     Plaintiff responded that the RIDOC did not do anything because there had been no sick call.

85.     The doctor said, "How is that possible?"

86.     CO Bonafilo confirmed to the doctor that there had been no sick call for at least three days.

87.     Plaintiff then underwent an ultrasound with arterial venous doppler, which found, "The right testis is heterogenous, hypoechoic and demonstrates markedly diminished flow.  The right spermatic cord is edematous and demonstrates evidence of twisting.  Appearances are those of right testicular torsion."

88.     Plaintiff was recommended for surgery as a result of the ultrasound; Alejandra Balen, M.D. wrote in Plaintiff's chart, "47yo man sip R IHR 1/28/19 with right testicle pain, swelling and erythema since 1/30/19 with exam and ultrasound demonstrating testicular torsion. Given time course of pain it is possible that the testicle is non-viable. Because ultrasound demonstrates twisting of the spermatic cord this is unlikely to be simple ischemia from disruption of the blood to the testicle. Patient was counseled that it is very possible he will lose the right testicle. He understands. Without urgent intervention patient is very likely to lose testicle."

89.     Plaintiff was surprised and horrified to receive this news, especially after the days of pain and frustration caused by numerous RIDOC employees refusing to have Plaintiff evaluated or evaluate him despite knowing that he had just had surgery and needed to be closely monitored.

90.     A medical note entered by Erin Fuller, M.D. stated: "47 yo M with no significant PMH sip open R inguinal hernia repair 1/28/19 (Connolly) presenting with pain and swelling in right testicle. Ultrasound concerning for testicular torsion. Discussed with urology who reviewed imaging and agree there is evidence of torsion, unclear how this is related to previous surgery.

- To OR with urology for detorsion, orchiopexy, and possible orchiectomy

- Follow up in clinic with Dr. Connolly next week

- Discussed with senior Dr. Kuruvilla and attendings Dr Shapiro and Dr. Connolly."

91.     Following the ultrasound, the same ER doctor spoke to Plaintiff gain and said, "You are going to lose your right testicle today.  There is most likely no way to save it.  It has possibly been dead for up to two days.  If you had gotten here sooner, there is a possibility that I could have saved it."

92.     Plaintiff was taken to the operating room for surgeon Mark Sigmond, M.D. ("Dr. Sigmond") to undergo a "Scrotal Exploration, Right orchiectomy."

93.     During the exploratory surgery, Dr. Sigmond found, "1. EUA with right testicle with hydrocele, no palpable twist in cord. 2. Scrotal exploration with edematous dartos and tunica vaginalis. Straw colored hydrocele. Testicle with severe venous congestion. No twist in cord. Intraoperative doppler with no flow. Consistent with likely venous insult. Right orchiectomy performed."

94.     Following the surgery, Dr. Sigmund confirmed to Plaintiff that his right testicle could not be saved and had to be removed.

95.     Dr. Sigmund said to Plaintiff, "It's good that you came in now, if you have waited any longer, it probably would have affected your left testicle."

### *Director of the DOC*

96.     As Director, Coyne-Fague is statutorily responsible for the overall management, administration, and supervision of the Rhode Island prison system pursuant to R.I. Gen. Laws § 42-56-10 *et. seq*.

97.     Pursuant to R.I. Gen. Laws § 42-56-1, *et seq*., Defendant Coyne-Fague, in her capacity as Director of the DOC, is the chief policy-making official of the DOC and she is responsible for promulgating and implementing DOC rules and regulations.

98.     Pursuant to R.I. Gen. Laws § 42-56-10, Defendant Coyne-Fague, in her capacity as Director of the DOC, is responsible for, *inter alia*, the hiring, training, supervision, and discipline of all employees of the DOC, including the individual Defendants, as well as for the overall management of the DOC.

99.     On information and belief, Defendant Coyne-Fague delegates, in whole or in part, her foregoing described responsibilities under R.I. Gen. Laws § 42-56-1, *et seq*. to other employees and agents of the DOC, including the individual Defendants.

### *Medical Director of DOC*

100.     On information and belief, Defendant Clarke, RIDOC Medical Director was specifically aware that there was no sick call available to inmates in the Medium Security Facility between January 30, 2019 and February 1, 2019, because she was responsible for all staffing and medical care decisions for all facilities operated and managed by the RIDOC.

101.     Upon information and belief, Defendant Clarke had actual or constructive knowledge of violations of the Plaintiff's constitutional rights and knew or had constructive notice of the practices that led to them but did not act to stop or curb them.

102.    Upon information and belief, Defendant Clarke created, maintained, and/or implemented policies or customs acquiescing to, allowing, encouraging, and/or ratifying these unlawful acts.

103.    Upon information and belief, Defendant Clarke was specifically aware of the violations of the Plaintiff's constitutional rights, after Plaintiff wrote her a letter on February 1, 2020 detailing the RIDOC's failure to provide any medical care between January 29th and February 1st, but Defendant Clarke still took no action to prevent the ongoing practices of denying sick call to inmates in the Medium Security Facility.

### *Warden of Medium Security Facility*

104.    On information and belief, Defendant Diniz was specifically aware that there was no sick call available to inmates in the Medium Security Facility between January 30, 2019 and February 1, 2019, because it was announced on loudspeakers throughout the Facility each day.

105.    On information and belief, despite being aware that the RIDOC was not providing medical care to inmates in violation of constitutional and statutory law, Defendant Diniz, Warden of Medium Security Facility at the time, is believed to have taken no action to inform correctional and medical staff in the Medium Security Facility that inmates must be provided medical care and should be taken to the medical facilities in the Intake Facility if medical care is needed.

### **Official Policy and Conduct of Defendant Coyne-Fague and Other Defendants**

106.    The customs, practices, and/or policies complained of herein constitute an official policy or custom of the Defendant State that was promulgated, created, acquiesced to, permitted, condoned, encouraged, and/or ratified by the chief policy-making official of the DOC, Defendant Coyne-Fague.

107.    The Defendants failed to properly select, train, instruct, supervise and discipline employees and agents of the DOC, including the individual Defendants, relative to the proper provision of post operative care and monitoring and the proper provision and supervision of medical care and treatment.

108.    Specifically, despite easily available resources at both Intake and Rhode Island Hospital, on this occasion and with substantial frequency at other times, as reported by numerous inmates over many years, Defendants ordered, allowed, and/or acquiesced to DOC correctional officers and medical professionals refusing medical evaluation and/or care on the basis of "sick call" being unavailable due to time of day, holidays, staffing issues, or for no reported or articulated reason at all.

109.    Defendants were aware of these practices and the likelihood of preventable injury and harm due to them, and their illegality, because they receive general reports about the medical situation at the facility, incident reports when inmates suffer serious harm and/or need emergency medical attention, because "no sick call" is announced throughout the facility when it happens, and because they have previously been sued by numerous inmates for such refusals to provide medical care on numerous occasions before the events outlined herein and because these practices violate both DOC policy and Federal and State law.

110.    The Defendant State is liable in tort under the doctrine of *respondeat superior* for the acts and/or omissions of its agents, including, but not limited to, the individual Defendants, committed within the scope of their employment, which proximately caused the harm of which the Plaintiff complains.

*Harm and Damages*

111.    That the Defendants refusal to provide any medical care to Plaintiff, particularly in light of his serious and obvious need for such care, amounted to cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article 1, §8 of the Rhode Island Constitution and cause the harm as aforesaid.

112.    That the Defendants' acts and/or omissions as aforesaid violated clearly established constitutional and/or statutory rights of Plaintiff, of which the Defendants knew or should have known.  Furthermore, at all relevant times, the Defendants knew or should have known that their conduct would cause or contribute to the deprivation of the Plaintiff's clearly established constitutional and/or statutory rights.

113.    That at all relevant times, the Defendants acted intentionally, willfully, wantonly, maliciously, and/or with reckless or callous indifference or gross negligence amounting to deliberate indifference to the Plaintiff's constitutional and/ or statutory protected rights.

114.    As a result of the acts and/or omissions of the Defendants, including but not limited to those set forth above, the Plaintiff sustained personal injuries and has endured and will continue to endure great pain and suffering, incur expenses for medical care and treatment, incur lost wages and earning capacity, and suffer other great damage.

## VI.    <u>Claims for Relief</u>

115.    Plaintiff incorporates in the counts below the allegations contained in ¶¶1 through 114 above.

**COUNT ONE**
***Violation of the Right of Freedom from Cruel and Unusual Punishment
under 42 U.S.C. § 1983***

116.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived the Plaintiff of his right to be free from cruel and unusual punishment, causing the Plaintiff to suffer harm as aforesaid, and have thereby deprived the Plaintiff of rights secured under the Eight and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983.

**COUNT TWO**
***Violation of the Right of Freedom from Cruel and Unusual Punishment
under Article 1, §8 of the Rhode Island Constitution***

117.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived the Plaintiff of his right to be free from cruel and unusual punishment, causing the Plaintiff to suffer harm as aforesaid, and have thereby deprived the Plaintiff of rights secured under Article 1, §2 of the Rhode Island Constitution.

**COUNT THREE**
***Negligence***

118.    Defendants, by their individual and/or collective acts and/or omissions, including but not limited to those alleged herein, breached their duty of care owed to the Plaintiff, thereby proximately causing the Plaintiff to sustain damages as alleged herein.

## COUNT FOUR
### *Medical Malpractice*

119.    Defendants Clark, Elling, Ware, and Smith, by their individual and/or collective acts and/or omissions, including but not limited to those alleged herein, failed to exercise that degree of skill and diligence required of the average medical professional engaged in the practice of medicine, specializing in their respective specialty, in this locality or a similar locality, and thus breached their duty of care owed to the Plaintiff, thereby proximately causing the Plaintiff to sustain damages as alleged herein.

## VII.    Prayers for Relief

**WHEREFORE**, the Plaintiff prays that this Court grant the following relief:

1.    A declaratory judgment declaring that the Defendants, in the manner described herein, subjected the Plaintiff to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment to the United States Constitution and Article 1, §8 of the Rhode Island Constitution;

2.    An award of compensatory damages;

3.    An award of punitive damages;

4.    An award of any other damages or relief available under applicable law;

5.    An award of reasonable attorney's fees and costs of litigation to the Plaintiff pursuant to 42 U.S.C. §1988 and/or other applicable law; and,

6.    Such other and further relief as this Court deems just and proper.

## VIII.    Demand for Jury Trial

The Plaintiff hereby demands a trial by jury on all counts so triable.

## IX.    Designation of Trial Counsel

The Plaintiff hereby designates Richard A. Sinapi, Esquire, as trial counsel.

Plaintiff,
By his Attorneys,
**SINAPI LAW ASSOCIATES, LTD.**


Date:  **January 26, 2022**          /s/ **Richard A. Sinapi**_____
                                     **Richard A. Sinapi, Esq. (#2297)**
                                     **Chloe A. Davis, Esq. (#9334)**
                                     2374 Post Road, Suite 201
                                     Warwick, RI 02886
                                     Phone: (401) 739-9690; Fax (401) 739-9040
                                     Email:  ras@sinapilaw.com; cad@sinapilaw.com

## CERTIFICATION

I hereby certify that I filed the within document via the ECF filing system and that a copy  is available for viewing and downloading.  I have also caused a copy to be sent via the ECF system  to the attorneys of record on this **26th** day of **January**, **2022**.

**/s/ Richard Sinapi**